# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEWPAGE CORPORATION, *et al.*, | ) | Case No. 11-12804 (KG) |
| | ) | (Jointly Administered) |
| Reorganized Debtors. | ) | |
| | ) | |
| | ) | |
| PIRINATE CONSULTING GROUP, LLC, | ) | |
| as litigation trustee of the NP Creditor | ) | |
| Litigation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AVOCA BEMENT CORP. and KNIGHT | ) | Adv. Pro. No. 13-52196 (KG) |
| HAWK COAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| AVOCA BEMENT CORP., | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CANADIAN NATIONAL RAILWAY | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| | ) | **Re: Adv. Dkt. Nos. 41 and 43** |

## MEMORANDUM OPINION

Before the Court are identical motions for summary judgment filed by the defendants in this adversary proceeding, Knight Hawk Coal, LLC ("Knight Hawk") and

Avoca Bement Corp. ("Avoca"; collectively the "Defendants").[1] On September 5, 2013, Pirinate Consulting Group, LLC, as litigation trustee for the NP Creditor Litigation Trust (the "Trustee"), initiated this adversary proceeding against the Defendants seeking to recover $2,805,745.25 in allegedly preferential transfers. The Defendants seek entry of summary judgment in their favor on all counts of the Trustee's adversary complaint based on the United States Court of Appeals for the Third Circuit's *Kiwi* decision. *See Kimmelman v. Port Auth. of New York & New Jersey* (*In re Kiwi Int'l Air Lines, Inc.*), 344 F.3d 311 (3d Cir. 2003) ("*Kiwi*"). For the reasons that follow, the Court agrees with the Defendants and will enter summary judgment in their favor on all counts of the Trustee's adversary complaint.

## JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to issue a final order pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, in order to succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1] Avoca adopted Knight Hawk's motion for summary judgment, brief in support of its motion for summary judgment, and reply brief in their entirety. Avoca Mot. for Summ. J. ¶ 3 [Adv. D.I. 43]; Avoca Reply Br. 1 [Adv. D.I. 50].

FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8 (1986) (emphasis in original). A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute regarding a material fact is genuine "when reasonable minds could disagree on the result." *Delta Mills, Inc. v. GMAC Comm. Fin., Inc.* (*In re Delta Mills, Inc.*), 404 B.R. 95, 105 (Bankr. D. Del. 2009).

Summary judgment is designed to avoid the expense of a trial where the facts are settled and the dispute turns on an issue of law. *Delta Mills*, 404 B.R. at 104. To this end, the Court's "function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In performing this function, the Court must draw all inferences "in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

"The movant must put the ball in play, averring 'an absence of evidence to support the nonmoving party's case.'" *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The burden then shifts to the non-movant to "present definite, competent evidence to rebut the motion." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991). *See also Delta Mills*, 404 B.R. at 105. "[T]he nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda

and briefs to establish a genuine issue of material fact. Instead, it 'must make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by the depositions and admissions on file.'" *Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 511 (3d Cir. 1994) (quoting *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992)). *See also* FED. R. CIV. P. 56(c)(1) ("Supporting Factual Positions").

## BACKGROUND

The material facts are not in dispute.[2] At all times relevant to the Trustee's complaint, the Debtors[3] produced and sold coated paper and specialty paper products used in, among other things, magazines, advertising materials, catalogs, and textbooks. The affiliate debtor at issue in this adversary proceeding, NewPage Wisconsin System, Inc. ("NewPage Wisconsin"), is a Wisconsin corporation which owned and operated paper mills in Wisconsin and Minnesota. Prior to the petition date, NewPage Wisconsin entered into a "Coal Supply Agreement," dated July 6, 2010, with the Defendants (the "Coal Supply Agreement"). Knight Hawk Mot. for Summ. J. App. A [hereinafter "App. A"], 60-

---

[2] While Knight Hawk supported its motion for summary judgment (adopted by Avoca) with affidavits and other documents from the docket of the main case, the Trustee did not file any affidavits or other evidentiary-quality materials in connection with its objection to the Defendants' motions for summary judgment, evidently electing to challenge the Defendants' motions only on a legal basis.

[3] The Debtors are NewPage Corporation, Chillicothe Paper Inc., Escanaba Paper Company, Luke Paper Company, NewPage Canadian Sales LLC, NewPage Consolidated Papers Inc., NewPage Energy Services LLC, NewPage Group Inc., NewPage Holding Corporation, NewPage Port Hawkesbury Holding LLC, NewPage Wisconsin System Inc., Rumford Paper Company, Upland Resources, Inc., and Wickliffe Paper Company.

4

63, 84-87. Under the terms of the Coal Supply Agreement, Avoca (defined as "Agent") "acting with and for" Knight Hawk (defined as "Seller") agreed to sell and NewPage Wisconsin agreed to buy coal of a certain quality, quantity, and price for a two-year term beginning January 1, 2011 and ending December 31, 2012. *Id.* The quantity term of the Coal Supply Agreement provided that "[a]nnual volume will be approximately 105,000 tons to be shipped at approximately 2,000 to 2,200 tons per week." *Id.*[4]

On September 7, 2011, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Among the Debtors' first-day motions was a motion seeking authority to pay pre-petition claims of certain critical vendors [Main Case D.I. 18] (the "Critical Vendor Motion"). On September 8, 2011, the Court entered an order granting the Debtors' Critical Vendor Motion [Main Case D.I. 58] and on October 11, 2011, the Court entered an amended order granting the motion [Main Case D.I. 337] (the "Critical Vendor Order"). The Critical Vendor Order authorized the Debtors to pay certain pre-petition claims of critical vendors so long as the critical vendors continued to provide goods and services on "Customary Trade Terms."[5] The Critical Vendor Order further authorized the Debtors to obtain "written verification" that the critical vendor would continue to provide

---

[4] The Coal Supply Agreement is the second such agreement between NewPage Wisconsin and the Defendants. A similar agreement was in effect between the parties from January 1, 2009 through December 31, 2010. As discussed *infra*, NewPage Wisconsin and the Defendants entered into a third such agreement which took effect January 1, 2013 and extends through December 31, 2014.

[5] "Customary Trade Terms" is defined in the Critical Vendor Order as "the most favorable terms in effect between such Critical Vendor and the Debtors in the 12 months before the [petition date], or such other favorable terms as the Debtor and the Critical Vendor may otherwise agree."

5

goods and services on Customary Trade Terms. Under the terms of the Critical Vendor Order, if the critical vendor accepted payment on its pre-petition claim but did not provide goods and services on Customary Trade Terms, the payment was deemed to be an unauthorized post-petition transfer under § 549 of the Bankruptcy Code and recoverable by the Debtors.

Pursuant to the Critical Vendor Order, the Debtors and Defendants entered into an agreement memorialized in a "Critical Vendor Letter" dated November 4, 2011, and signed by representatives of the Debtors and Defendants (the "Critical Vendor Agreement"). App. A at 71-74. Under the terms of the Critical Vendor Agreement the Debtors agreed to grant the Defendants an administrative claim in the amount of $128,565.92 pursuant to § 503(b)(9)[6] of the Bankruptcy Code, representing pre-petition amounts due under the Coal Supply Agreement. App. A at 72. In return, the Defendants agreed to "extend to the Debtors all Customary Trade Terms, which shall comply with the terms and provisions set forth in the Coal Supply Agreement." App. A at 72. Additionally, under the terms of the Critical Vendor Agreement the Defendants reserved their rights to pursue "a claim arising under section 503(b)(9) of the Bankruptcy Code or pursuant to [their] rights under section 365[7] of the Bankruptcy Code as a party to the Coal Supply Agreement . . . ." App. A at 72.

---

[6] Section 503(b)(9) provides for an administrative expense for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."

[7] As discussed in more detail *infra*, § 365 of the Bankruptcy Code provides for the assumption or rejection of executory contracts and unexpired leases.

6

On December 14, 2012 (the "Confirmation Date"), the Court entered an order [Main Case D.I. 2945] confirming the Debtors' Modified Fourth Amended Joint Chapter 11 Plan [Main Case D.I. 2904] (the "Plan"). On December 21, 2012, the Plan became effective [Main Case D.I. 3014]. Article V of the Plan established the NP Creditor Litigation Trust (the "Trust") and appointed the Trustee to, as is relevant here, liquidate preference claims arising under § 547 of the Bankruptcy Code for the benefit of Trust beneficiaries. Plan §§ 5.1, 5.7. *See also* Plan Schedule 1.2.95 ("NP Creditor Litigation Trust Agreement") [Main Case D.I. 2909-2]. Article VIII of the Plan provided for the assumption or rejection of executory contracts and unexpired leases. As is relevant here, under Article VIII of the Plan an executory contract that: (1) "has not expired by its own terms on or prior to the Confirmation Date"; (2) was not assumed or rejected with Court approval prior to the Confirmation Date; (3) was not subject to a motion to assume or reject as of the Confirmation Date; and (4) was not otherwise accorded specific treatment by virtue of being listed on Plan Schedules 8.1(A)-(E) was automatically deemed to be assumed by the Debtors (the "Catchall Provision"). Plan § 8.1; Plan Schedule 8.1 [Main Case D.I. 2909-5]. Article VIII of the Plan further provided that "[e]ntry of the Confirmation Order . . . shall constitute approval of the assumptions pursuant to section 365(a) of the Bankruptcy Code . . . ."

The Coal Supply Agreement was not listed on Plan Schedules 8.1(A)-(E)[8], assumed or rejected with Court approval prior to the Confirmation Date, or the subject of a motion to assume or reject as of the Confirmation Date. After the Confirmation Date but prior to December 31, 2012, Knight Hawk supplied three shipments of coal to NewPage Wisconsin, totaling 3,791.65 tons, for which Avoca invoiced NewPage Corporation[9] in the aggregate amount of $326,081.90. App. A at 56, 79. On December 31, 2012, pursuant to its terms, the Coal Supply Agreement expired. NewPage Wisconsin and the Defendants entered into a subsequent agreement, dated September 27, 2012, for the purchase and sale of coal for a two-year term beginning January 1, 2013 and ending December 31, 2014 (the "Subsequent Coal Supply Agreement"). App. A at 88-93. In substance the Subsequent Coal Supply Agreement is similar to the Coal Supply Agreement but the terms are not identical. The quantity term of the Subsequent Coal Supply Agreement provides that:

> During 2013, Seller shall supply and Buyer may purchase up to approximately 110,000 tons of coal. During 2013, Seller shall supply up to approximately 2,000 tons of coal per week. By August 1, 2013, Buyer shall provide Seller written notice identifying the tons of coal that Seller shall supply Buyer in 2014. The 2014 volume of coal purchased by Buyer from Seller shall be equal to at least 95% of the volume of coal consumed by Buyer's Biron, WI mill boiler No. 4.

App. A at 88.

---

[8] An executory contract with Avoca was listed on the Debtors' amended schedule G (executory contracts and unexpired leases) of the schedules of assets and liabilities filed in support of their bankruptcy petitions. App. A at 11-17.

[9] The Debtors utilized a centralized cash management system whereby NewPage Corporation satisfied payables of its affiliates, including NewPage Wisconsin.

On September 5, 2013, the Trustee initiated this adversary proceeding by filing its adversary complaint seeking avoidance and recovery of $2,805,745.25 in allegedly preferential pre-petition transfers to the Defendants pursuant to §§ 547 and 550 of the Bankruptcy Code. On December 11, 2011, the Defendants filed their answers to the Trustee's complaint, each raising an affirmative defense based on the Third Circuit's *Kiwi* decision. Avoca Answer 6 [Adv. D.I. 10]; Knight Hawk Answer 6 [Adv. D.I. 11]. On May 29, 2014, Knight Hawk filed its motion for summary judgment [Adv. D.I. 41] and brief in support [Adv. D.I. 42] based on its *Kiwi* defense. On May 30, 2014, Avoca filed its motion for summary judgment [Adv. D.I. 43], which adopted Knight Hawk's motion and brief in their entirety. On June 19, 2014, the Trustee filed its objection to the Defendants' motions for summary judgment [Adv. D.I. 47]. On July 3, 2014, Knight Hawk filed its reply brief [Adv. D.I. 49], which Avoca subsequently adopted as well [Adv. D.I. 50]. On July 16, 2014, the Trustee filed a request for oral argument [Adv. D.I. 54] and the Court heard argument on the matter on September 16, 2014.

## ANALYSIS

As the material facts are undisputed, all that is left for the Court is to determine whether the Defendants are entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). In order for the Trustee to avoid an allegedly preferential transfer pursuant to § 547 of the Bankruptcy Code, it must satisfy the elements set forth in the statue itself:

> Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;

9

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

In *Kiwi*, the Third Circuit held that a trustee may not employ § 547 to avoid pre-petition transfers made pursuant to an executory contract which the trustee or debtor in possession assumed post-petition. *Kiwi*, 344 F.3d at 317-19, 321. The *Kiwi* holding was based on the Third Circuit's observation that before a trustee or debtor in possession may assume a contract pursuant to § 365 of the Bankruptcy Code, it must "cure all defaults, assure future performance, and make the other contracting party whole." *Id.* at 318. *See also* 11 U.S.C. § 365(b)(1). Since the contract creditor whose contract is assumed would be paid in full pursuant to § 365, a trustee seeking to avoid as preferential pre-petition transfers made pursuant to the contract could not satisfy § 547(b)(5) (the liquidation analysis). *Kiwi*, 344 F.3d at 318-19. Accordingly, the Defendants argue that the Coal Supply Agreement was an executory contract that was assumed under the Catchall

Provision of Article VIII of the Plan and so under *Kiwi* the Trustee may not avoid as preferential pre-petition transfers made pursuant thereto.

The Trustee's counterargument is three pronged. First, the Trustee argues that the Coal Supply Agreement was not an executory contract because the "Debtors had no material obligations thereunder." Trustee Obj. 11. In the Third Circuit, an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3rd Cir. 1989). The Trustee argues that since the Coal Supply Agreement did not require that NewPage Wisconsin purchase a specific or minimum amount of coal or provide for a breach or remedy in the event that NewPage Wisconsin did not purchase any coal at all, NewPage Wisconsin did not have any material unperformed obligations under the Coal Supply Agreement as of the petition date. The lack of specificity in the Coal Supply Agreement is especially striking, according to the Trustee, when compared to the relatively more detailed quantity term in the Subsequent Coal Supply Agreement, which, in the Trustee's view, requires that NewPage Wisconsin purchase a minimum amount of coal. To the extent NewPage Wisconsin's only post-petition obligation under the Coal Supply Agreement was the payment of money, the Trustee argues that is not enough to make it an executory contract. *See In re Supermedia, Inc.*, 2013 WL 5567838, at *3 (Bankr. D. Del. Oct. 9, 2013) ("where the payment of money is the only remaining performance, a contract is not executory").

In support of its argument, the Trustee cites *Kaye v. A.R.E. Distribution & Alpine Records, LLC* (*In re Value Music Concepts, Inc.*), 329 B.R. 111 (Bankr. N.D. Ga. 2005). In *Kaye,* the United States Bankruptcy Court for the Northern District of Georgia found that a pre-petition settlement agreement was not an executory contract. *Id.* at 122. The Court characterized the settlement agreement as "a business divorce between two recently married groups of companies, settling disputes and dividing up assets." *Id.* at 123. The Court further observed that the settlement agreement "did not contemplate any significant ongoing business relationships among the parties of the type that are typically present when a contract is found to be executory." *Id.* Additionally, the Trustee cites a footnote of the Critical Vendor Motion in which the Debtors stated that they did not "intend" to categorize vendors that are a party to an executory contract as critical. Critical Vendor Motion 6 n.3.

The Court finds more persuasive the cases cited by the Defendants. In *Carolina Fluid*, Judge Christopher S. Sontchi of this Court determined that a supply agreement under which the defendant "agreed to supply parts to the Debtors based on the requirements of the Debtors, and the Debtors have agreed to buy the parts required, at a rate specified in the Supply Contract" was an executory contract. *Guiliano v. Almond Inv. Co.* (*In re Carolina Fluid Handling Intermediate Holding Corp.*), 467 B.R. 743, 754 (Bankr. D. Del. 2012) ("*Carolina Fluid*"). Judge Sontchi found that the "Supply Agreement evidences an on-going requirement for supply and purchase of parts" and so was executory and subject to assumption. *Id.* As here, *Carolina Fluid* involved a preference action and Judge Sontchi ultimately entered summary judgment in favor of the defendant based on the *Kiwi* decision. *Id*. at 757.

Similarly, in *Sharon Steel* the Third Circuit affirmed the United States Bankruptcy Court for the Western District of Pennsylvania's determination that a natural gas service agreement under which the supplier agreed to deliver natural gas to the debtor based on a certain rate schedule was an executory contract. *Sharon Steel*, 872 F.2d at 39. The Third Circuit observed that "[t]he agreement is characterized by reciprocal obligations continuing into the future: [the supplier] has promised to provide natural gas to [the debtor], and [the debtor] has promised to purchase the gas at a certain price under the [] rate schedule." *Id.*

The Trustee asserts that *Carolina Fluid* and *Sharon Steel* are distinguishable because the purchasing parties under the agreements at issue were required to purchase a certain minimum quantity. While the Coal Supply Agreement could perhaps have been clearer with respect to a minimum quantity requirement and remedies, the Court is persuaded that, as in *Carolina Fluid* and *Sharon Steel*, the Coal Supply Agreement evidences ongoing, reciprocal obligations for supply and purchase. If, for example, NewPage Wisconsin had purchased only 50,000 tons of coal in 2012, it would certainly have been in breach of the Coal Supply Agreement as 50,000 tons is not approximately 105,000 tons. The same would be true of the Defendants had they supplied only 50,000 tons of coal in 2012. Further, the Court finds that the Coal Supply Agreement had not expired by its own terms as of the Confirmation Date since the parties were obligated to supply and purchase and did in fact supply and purchase several thousand tons of coal pursuant to the Coal Supply Agreement after the Confirmation Date.

Finally, the Court declines to bind the Defendants to the Debtors' intention, as expressed in footnote 3 of the Critical Vendor Motion, that parties to executory contracts

not be classified as critical vendors. At any rate, whether or not the Debtors believed that the Defendants were parties to an executory contract when the Debtors and Defendants executed the Critical Vendor Agreement is irrelevant. As explained by Judge Sontchi in *Carolina Fluid*:

> The Debtors requested that [the creditor] enter into a [Critical Vendor] Agreement. [The creditor] declined. The Trustee argues that, as a result of such conduct, the Debtors believed [the creditor] to be a critical vendor rather than a counterparty to an executory contract. Whether a "critical trade vendor" is a vendor, supplier, licensor, landlord, subcontractor, counter-party to an executory contract, etc., etc. is irrelevant. The basis and point of a critical [vendor] order is to give a debtor authorization to pay pre-petition services or goods when necessary to preserve the debtor's estate. Indeed, one of the primary bases for issuing the relief is to avoid having to inquire or to litigate the details of the relationship of the parties, e.g. executory contract or supply agreement, because there is *no time* to do so.

467 B.R. at 755. Further, the Critical Vendor Order provides that "nothing in the [Critical Vendor] Motion or this Order shall be deemed to constitute the postpetition assumption of an executory contract between the Debtors and any third party." The clear implication of this language is that the Court recognized the possibility that a critical vendor may also be a party to an executory contract. Accordingly, the Court finds that the Coal Supply Agreement was an executory contract which was eligible for assumption under the terms of Article VIII of the Plan as of the Confirmation Date.[10]

---

[10] The Trustee also makes much of the fact that the Debtors took the time to list more than 1,000 executory contracts on Plan Schedules 8.1(A)-(E) but did not list the Coal Supply Agreement. In the Trustee's view, if the Debtors believed the Coal Supply Agreement was an executory contract, they would have taken the time to accord the contract specific treatment by listing it on Plan Schedules 8.1(A)-(E). Again, the Court declines to hold the Defendants

14

The Trustee next argues that the Coal Supply Agreement was not eligible for assumption under Article VIII of the Plan because the Critical Vendor Agreement replaced and superseded the Coal Supply Agreement prior to the Confirmation Date. In support of its argument the Trustee cites Wisconsin case law on the common law contract doctrine of novation and points out a number of terms contained in the Critical Vendor Agreement that are not contained in the Coal Supply Agreement. The Trustee further contends that it is not common practice for debtors to grant suppliers which are a party to an executory contract critical vendor status—if the debtor could simply assume and enforce the executory contract pursuant to § 365, there would be no reason to grant the vendor any extra benefit attendant to critical vendor status. The Trustee asserts that the Critical Vendor Agreement was in effect up to the Confirmation Date, after which the parties operated without a formal written agreement until the effective date of the Subsequent Coal Supply Agreement.

The Court, though, is persuaded, as the Defendants argue, that the Critical Vendor Agreement, while related to the Coal Supply Agreement, is a separate agreement that did not supersede or replace the Coal Supply Agreement. In the Critical Vendor Agreement, the Debtors simply agreed to a certain favorable treatment of the Defendants' pre-petition claim and in return the Defendants agreed to continue to perform their obligations under the Coal Supply Agreement. In other words, the parties agreed to maintain the *status quo*

---

responsible for the Debtors' actions. Further, the Catchall Provision clearly provides for the assumption of executory contracts which are not listed in Plan Schedules 8.1(A)-(E) (and which satisfy the other requirements of the Catchall Provision). Accordingly, the fact that the Debtors did not list the Coal Supply Agreement on Plan Schedules 8.1(A)-(E) does not affect the Court's analysis.

because, as Judge Sontchi recognized in *Carolina Fluid*, there was no time to inquire into the details of the relationship between the Debtors and Defendants, i.e. whether or not the Coal Supply Agreement was an executory contract. *See Carolina Fluid*, 467 B.R. at 755. The fact that the Defendants specifically reserved their rights with respect to § 365 in the Critical Vendor Agreement only strengthens the argument that it is a separate agreement which did not supersede or replace the Coal Supply Agreement.

      Further, the Critical Vendor Order, as is relevant here, only authorized the Debtors to pay certain pre-petition claims of critical vendors and obtain "written verification" that the critical vendor will continue to provide "Customary Trade Terms." The Critical Vendor Order did not authorize the debtor to enter into a new, stand-alone supply agreement. Thus, the Critical Vendor Agreement is most accurately characterized as written verification that the Debtors and Defendants would continue to operate pursuant to the terms of the Coal Supply Agreement and is not a new, stand-alone supply agreement as the Trustee suggests. The Critical Vendor Agreement in this instance is similar to a reaffirmation agreement. *See* 11 U.S.C. § 524(c). Just as a reaffirmation agreement does not supersede or replace the underlying contract, the Critical Vendor Agreement did not supersede or replace the Coal Supply Agreement.

      Finally, the Trustee argues that the Coal Supply Agreement was not eligible for assumption under Article VIII of the Plan because the parties executed the Subsequent Coal Supply Agreement several months prior to the Confirmation Date, which was meant to govern the post-bankruptcy business relationship of the Debtors and Defendants. The Trustee asserts that there would be no benefit to the Debtors to assume the Coal Supply

Agreement on the Confirmation Date since the Subsequent Coal Supply Agreement was already in place.

The Trustee's argument seems to rest on the fact that the Confirmation Date happened to be only seventeen days prior to the expiration date of the Coal Supply Agreement. It is clear to the Court, especially given the January 1, 2013, effective date of the Subsequent Coal Supply Agreement, that the Debtors and Defendants intended for their relationship to be governed by the Coal Supply Agreement through December 31, 2012, after which the Subsequent Coal Supply Agreement took effect. The Debtors and Defendants conducted over $300,000.00 worth of business after the Confirmation Date but prior to the expiration of the Coal Supply Agreement. So, clearly there was some benefit to the Debtors in assuming the Coal Supply Agreement, even though assumption occurred only a short time prior to the contract expiration date. Accordingly, the Court finds the Trustee's final argument to be without merit.

## **CONCLUSION**

For the reasons set forth above, the Court finds that the Debtors assumed the Coal Supply Agreement on the Confirmation Date in accordance with the Catchall Provision of Article VIII of the Plan. Pursuant to the Third Circuit's *Kiwi* decision, the Trustee may not recover allegedly preferential transfers which arose under a contract that the Debtors assumed post-petition. Therefore, the Defendants are entitled to judgment as a matter of

law on all counts of the Trustee's adversary complaint. Accordingly, the Court will grant the Defendants' motions for summary judgment. The Court will issue an order.

Dated: October 1, 2014

                                              KEVIN GROSS, U.S.B.J.